Michael J. Connolly, Esq.
FORMAN, HOLT, ELIADES & RAVIN, LLC
80 Route 4 East, Suite 290
Paramus, NJ 07652
(201) 845-1000
(201) 845-9112
mconnolly@formanlaw.com
Attorneys for Alleged Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In Re:

LESSNO LLC,

        Alleged Debtor.

-------------------------------------------------------X

Case No. 09-44979 (ESS)

Involuntary Chapter 7 Proceeding

## DECLARATION OF STEFAN MINCHEV

Stefan Minchev, of full age, pursuant to 28 U.S.C. §1746, declares as follows:

1.    I am currently Manager of Lessno Bulgaria EOOD. As of 9 October 2008 I held Power of Attorney by Ralitsa Bobochikova in her capacity as a member of the Advisory Board of Travel Technologies Solutions Cooperatief, which controlled the affairs of Lessno, LLC. I submit this Declaration as part of Lessno, LLC's trial submissions in this matter.

2.    Lessno, LLC is a limited liability company. As per the documentation I have reviewed, at the date of initial investment of Neveq in Lessno, Lessno LLC was owned by Mario Sotirov, Assen Vassilev, Bojanka Gyosheva and Ani M. Petrova-Sotirova. Assen Vassilev and Stanislav Gyoshev had been the original owners of Lessno LLC but, as seen from the company share register, on 30 June 2005 Stanislav Gyoshev had transferred his shares to his mother Bojanka Gyosheva, Mario Sotirov and Ani M. Petrova - Sotirova. All these individuals, with the

exception of Bojanka Gyosheva, are all petitioning creditors in this case. See Shareholders Agreement at 2.4.

3. To the extent of my knowledge, Neveq had not been supplied with a copy of the Ticketing Agreement with Smart Travel Network, Inc. during the due diligence period.

4. According to the executed documents I have reviewed, Neveq agreed to invest in Lessno initially $2,000,000 with possible increase of $1,000,000 thereafter. See Shareholder Agreement at p.1.

5. According to the executed documents I have reviewed, as part of the investment, Lessno entered into the March 27, 2008 Shareholder Agreement.

6. The Shareholder Agreement contemplated the creation of a holding company (Travel Technologies Solutions ("TTS")) to become the owner of the stock of Lessno, LLC and two other entities. The Shareholder Agreement also required the creation of a Board of Directors (called Advisory Board) of TTS to control the affairs of Lessno. The Board would consist of two members of Neveq and three members of Lessno's then existing shareholders. Board approval was required for various transactions described below by a 2/3 vote, thereby ensuring that at least one Neveq member of the Board would need to approve a transaction for which Board approval was required. Shareholder Agreement at Sections 3.01(b) and 3.02(d).

7. The Shareholder Agreement required Board approval for any contracts with Shareholders or an affiliate of a Shareholder. See Shareholder Agreement at Section 3.01 (c)(4).

8. The Shareholder Agreement also required Board approval for borrowing of funds over $100,000 (Shareholder Agreement at Section 3.01(c)(9)); entering into any contracts with material interest exceeding $50,000 (id. at Section 3.01(c)(10)); entering into any contract with a

company where Neveq or any of Lessno's then existing shareholders held any controlling interest (id. at Section 3.01(c)(16)).

9.  The Smart Travel Network, Inc. Ticketing Agreement was dated as of November 11, 2006 and had a term of one year. See Ticketing Agreement at Section 6.01 with an additional term of one year. Id. at 6.02.

10.  The Ticketing Agreement was not disclosed to the members of the Board at the second renewal date in November 2008.

11.  According to the TermSheet, dated 31 May 2007, which I have reviewed, Smart Travel Network, Inc. had been owned and operated by Ani Petrova-Sotirova and Mario Sotirov. Accordingly, the Ticketing Agreement should have been disclosed to Neveq during the due diligence period. Additionally, any renewal of the Ticketing Agreement beyond March of 2008 should have also been disclosed to the Board and a Neveq member of the Board would have been required to approve same.

12.  The first time the Ticketing Agreement was disclosed to me was on May 26, 2009 after Neveq's explicit request.

13. There are numerous objections to the Ticketing Agreement. First, primarily, the Ticketing Agreement is structured in such a way that Smart Travel is able to receive various credits and incentives that would otherwise be payable to Lessno, LLC. This is so Smart Travel placed all of Lessno, LLC's ticket bookings through an entity known as Worldspan. As part of the Worldspan agreement, as evidenced in the Worldspan Connectivity Software Addendum, Worldspan Inducement Agreement and Worldspan Subscriber Agreement, Smart Travel was entitled to certain incentive credits for bookings made through its account. Similarly, Smart

Travel was charged certain costs for GDS searches on its account which Smart Travel billed in full to Lessno.

14. Smart Travel ran all of Lessno's ticket bookings through its account, and some also through Trans Am Travel, with Worldspan as well as the ticket booking that Smart Travel engaged in separately. As a result, Worldspan issued credits to Smart Travel that arose as a result of Lessno's bookings. Lessno did not receive the advantage of these credits. Similarly, as seen from the available invoices, all of the charges processed through Worldspan were imposed upon Lessno. As a result, Smart Travel's invoices to Lessno: (i) may potentially include charges that Lessno did not incur; and, more importantly, (ii) fail to account for significant credits that should have reduced Lessno's bills.

15. I have reviewed the issue of the outstanding credits that were generated by Lessno through the bookings via Worldspan. My findings are set forth on the incentive credit charts that I prepared. As indicated therein, it appears that, for the period June 2008 – May 2009, Lessno has generated 41,413 bookings in Worldspan via Smart Travel, which according to the Worldspan Inducement Agreement have generated $51,766.84 credits. The amount of bookings generated by Lessno has also resulted in increased incentives for Smart Travel's own bookings from $546.87 to $3,543.16 during the period. Thus, for the period June 2008 – May 2009, Lessno had been deprived of $51,766.84. Based on the available invoices, it is estimated that since November 11, 2006, Lessno might have missed potential earnings of more than $100,000. This number can be precisely calculated having access to all of the invoices from Worldspan to Smart Travel since November 2006. Smart Travel have allegedly received those credits that should have been paid to Lessno or otherwise used to reduce the amounts owed under the Smart Travel invoices.

16. The terms of the Smart Travel Ticketing Agreement are similar to the terms of a ticketing agreement with an entity known as Trans Am Travel. However, Mr. and Ms. Sotirov were principals of both Smart Travel and Lessno. They were aware of the diversion of the incentive credits for Smart Travel's behalf and allowed this valuable advantage to be diverted to Smart Travel without disclosing such information to the Board.

17. All authorized investments in Lessno and loans to the company have been reviewed and approved by the Board or the General Meeting. As a Member of the Board (via full PoA), I have not been acquainted with the terms on loans by Smart Travel Network, Assen Vassilev and/or Mario Sotirov (size, interest, period, etc.), prior to their execution, and I have never approved such loans. I have not seen, prior to 11 June 2009, nor approved promissory note in the amount of $40,000 by Smart Travel Network, and/or promissory note in the amount of BGN 83,000 and €21,500 by Mario Sotirov and Assen Vassilev.

18. The loans violated the restrictions in the Shareholders Agreement identified above. The loans also enabled the petitioning creditors to claim that they were owed money by Lessno in order to file this involuntary bankruptcy case. Indeed, while still employed by Lessno, Mr. Sotirov was engaged in soliciting creditors to join in an involuntary petition, as was revealed by a forensic analysis carried out by an independent company on his company notebook.

19. Further, at the time of the loans, Neveq was exploring additional investment and capital contribution efforts for Lessno. Rather than participating with those activities in a meaningful way, the petitioning creditors allegedly used the loans as a means to weaken Lessno's relationship with existing employees.

20. The petitioning creditors engaged in additional misconduct with respect to Lessno, LLC. The petitioning creditors blocked Lessno funds in certain company accounts to

which only the petitioners had signing and access authority. They have not released the funds to Lessno. Those funds are summarized on a chart that I prepared based on the available bank and accounting information and total over $29,000.

21. Petitioner Gyoshev provided a personal gaurantee for a corporate credit card issued in the name of Lessno LLC and funded by Lessno on a regular basis. Mr. Gyoshev's claim for reimbursement of the negative balance on the credit card is largely compensated by a number of personal items amounting over $10,000 which Mr Gyoshev had charged to the corporate credit card.

22. According to Lessno accounting and bank records, Mario Sotirov and Assen Vassilev also owe more than $2,300 to Lessno for personal expenses and not returned company equipment.

I declare under penalty of perjury that the foregoing statements made by me are true and correct.

_____
Stefan Minchev

Dated:  8 August 2011